**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**EDWARD BRISCOE**, individually and on behalf of all others similarly situated,

*Plaintiff,*

v.

**SELECT MEDICAL HOLDINGS CORPORATION and NATIONWIDE RECOVERY SERVICES, INC.**

*Defendant.*

Case No. ____________

CLASS ACTION COMPLAINT

JURY DEMAND

## CLASS ACTION COMPLAINT

Plaintiff Edward Briscoe, individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to him and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendants Select Medical Holdings Corporation ("Select") and Nationwide Recovery Services, Inc., ("NRS") (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1. Plaintiff brings this action on behalf of himself and all other individuals similarly situated ("Class Members") against Select Medical Holdings Corporation ("Select") Nationwide Recovery Services, Inc. ("NRS") for its failure to secure and safeguard the personally identifiable information ("PII") and private health information ("PHI") of Plaintiff and Class Members.

2. Select Medical Holdings Corporation is a healthcare services provider incorporated in the state of Delaware and maintains its corporate offices and principal place of business in Mechanicsburg, Pennsylvania. In the regular course of its business, Select is required to maintain

reasonable and adequate security measures to secure, protect, and safeguard their customers' PII/PHI against unauthorized access and disclosure.

3. Defendant Nationwide Recovery Services, Inc. is incorporated in Tennessee and maintains its corporate offices and principal place of business in Cleveland, Tennessee. NRS is Select's third-party vendor and provides services such as customer service, collections, and loss mitigation. In the regular course of its business, Nationwide Recovery Services, Inc. is required to maintain reasonable and adequate security measures to secure, protect, and safeguard their customers' PII against unauthorized access and disclosure.

4. Between approximately July 5, 2024, and July 11, 2024, an unauthorized third party gained access to NRS's network systems and accessed and copied files containing the PII/PHI of Select's patients.

5. Defendants owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to, or contracting with companies that failed to, implement and maintain reasonable security procedures and practices to protect their patients' PII/PHI from unauthorized access and disclosure.

6. Every year, millions of Americans have their most valuable PII/PHI stolen and sold online because of data breaches. Despite the dire warnings about the severe impact of data breaches on Americans of all economic strata, companies still fail to make the necessary investments to implement important and adequate security measures to protect their customers' and employees' data.

7. Defendant Select required its customers to provide it with their sensitive PII/PHI and failed to protect that PII/PHI. Defendants had an obligation to secure their customers' PII/PHI

by implementing reasonable and appropriate data security safeguards. This was part of the bargain between Plaintiff and Class Members and Select.

8. As a result of Select's failure to provide reasonable and adequate data security, Plaintiff's and the Class Members' unencrypted, non-redacted PII/PHI has been exposed to unauthorized third parties. Plaintiff and the Class are now at a much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII/PHI stolen here and the fact that the compromised PII/PHI is already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiff and the Class as they no longer have control over their PII/PHI, which is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

9. Plaintiff and the Class will incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

10. Plaintiff brings this action on behalf of himself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Select to ensure that its third-party vendors implement and maintain reasonable data security practices going forward.

## THE PARTIES

11. Plaintiff Edward Briscoe is a resident of Las Vegas, Nevada, whose Personal Information was compromised in the Data Breach.

12. Defendant Select Medical Holdings Corporation is a Delaware corporation, with its

headquarters and principal place of business located at 4714 Gettysburg Road, Mechanicsburg, Pennsylvania 17055. It may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

13. Defendant Nationwide Recovery Services, Inc. is a Tennessee corporation, with its corporate offices and principal place of business at 545 Inman St. W, Cleveland, TN 37311. It may be served through its registered agent: Cogency Global, Inc., 992 Davidson Dr., Ste. B, Nashville, TN 37205.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d), because there are more than 100 Class Members, at least one class member, including Plaintiff, is a citizen of a state different from that of Defendants, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

15. This Court has personal jurisdiction over Defendant Select Medical Holdings Corporation because it maintains its principal place of business in Pennsylvania.

16. This Court has personal jurisdiction over Defendant Nationwide Recovery Services, Inc. because it transacts business in this State and contracts for goods or services in this State.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant Select Medical Holding Corporation's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's and Class Members claims occurred in this District.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

18. This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e. the Class Members), seeking to redress Defendants' willful and

reckless violations of his privacy rights. Plaintiff and the other Class Members were customers of Defendants.

19. Between approximately July 5, 2024 and July 11, 2024, an unauthorized third party accessed and downloaded Plaintiff's and the Class Members' PII/PHI.

20. This action pertains to Defendants' unauthorized disclosures of the Plaintiff's PII/PHI that occurred between approximately July 5, 2024, and July 11, 2024 (the "Breach").

21. Defendants disclosed Plaintiff's and the other Class Members' PII/PHI to unauthorized persons as a direct and/or proximate result of Defendants' failure to safeguard and protect their PII/PHI.

22. By obtaining, collecting, and storing the PII/PHI of Plaintiff and Class Members, Select assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII/PHI from unauthorized disclosures.

23. Despite recognizing its duty to do so, Select failed to assess and monitor NRS's security safeguards to protect Plaintiff's and the Class Members' PII/PHI.

24. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII/PHI and relied on Select to keep their PII/PHI confidential and securely maintained, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

***The Data Breach***

25. According to a data breach notification ("Breach Notice") issued by Select, NRS discovered unauthorized access to its network systems occurring between approximately July 5, 2024 and July 11, 2024. During this time, an unauthorized third party accessed and copied files containing the PII of Select guarantors, including their names and Social Security numbers.

26. NRS first identified suspicious activity within its network on July 11, 2024,

resulting in an immediate investigation. NRS subsequently determined that certain files related to Select's guarantors had been accessed and copied by the unauthorized actor. NRS completed its extensive review of impacted files by approximately February 3, 2025, and notified Select of the breach on April 9, 2025.

27. The Breach Notice provided to affected individuals did not specify detailed measures or actions taken by Select or NRS to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

***The Data Breach was Preventable***

28. Had Select ensured that NRS maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, Select could have ensured sensitive customer data was not transferred to a vendor that was unequipped to protect it. Select's lack of oversight of NRS's security controls, and NRS's implementation of enhanced security measures only after the Data Breach, are inexcusable.

29. Defendants were at all times fully aware of their obligation to protect customers' PII/PHI and the risks associated with failing to do so. Defendants knew that information of the type collected, maintained, and stored by NRS is highly coveted and a frequent target of hackers.

30. This exposure, along with the fact that the compromised PII/PHI is already being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:




31. By 2013, it was being reported that nearly one out of four data breach notification recipients becomes a victim of identity fraud.[1]

32. Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to its encryption, which allows users and criminals to conceal identities and online activity.

33. When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[2]

34. In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attached targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[3]

---

[1] Pascual, Al, "2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters," *Javelin* (Feb. 20, 2013).

[2] *Shining a Light on the Dark Web with Identity Monitoring*, IdentityForce, Dec. 28, 2020, *available at:* https://www.identityforce.com/blog/shining-light-dark-web- identity- monitoring (last accessed July 28, 2021).

[3] https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx (Last visited August 22, 2023).

35. In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[4]

36. In May 2023, MCNA Insurance Company disclosed that the "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code . . . According to MCNA, the hackers were successful in accessing patient personal information."[5]

37. In April 2020, ZDNet reported in an article titled, "Ransomeware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomeware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[6]

38. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomeware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[7]

39. Another example is when the U.S. Department of Justice announced its seizure of

---

[4] *Id.*
[5] *Id.*
[6] https://www.zdnet.com/article/ransomeware-mentioned-in-1000-sec-filings-over-the-past-year/ (Last visited August 22, 2023).
[7] https://www.cisa.gov/sites/default/files/2023-01-CISA_MS-ISAC_Ransomware%20Guide_8508C.pdf (Last visited August 22, 2023).

AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[8]

40. The PII of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[9] Experian reports that a solen credit or debit card number can sell for $5 to $110 on the dark web.[10] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[11]

41. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

A dishonest person who has your Social Security number can use it to get other personal

---

[8] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, *available at:*https://www.armor.com/resources/blog/s tolen-pii-ramifications- identity-theft- fraud-dark-web/ (Last visited July 28, 2021).

[9] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal- data-sold- on-the-dark-web-how-much-it-costs/ (Last visited July 28, 2021).

[10] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask- experian/heres-how-much- your-personal-information-is-selling-for-on-the-dark-web/ (Last visited July 28, 2021).

[11] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (Last visited July 28, 2021).

> information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[12]

42. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

43. Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

44. Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

45. The PII compromised in the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth

---

[12] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (Last visited August 22, 2023).

[13] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen- by-anthem-s-hackers-has-millionsworrying- about-identity-theft (last visited July 28, 2021).

more than 10 times on the black market."[14]

46. Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

47. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

48. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

49. Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

50. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[15] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and the fraud can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face,

---

[14] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells- for-10x-price-of-stolen-credit-card-numbers.html (last visited July 28, 2021).

[15] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), https://www.gao.gov/assets/gao- 07-737.pdf (last visited July 28, 2021).

"substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[16]

51. The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

***Defendants Failed to Comply with the Federal Trade Commission***

52. Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[17]

53. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principals for business.[18] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted form the system; and have a response

---

[16] *Id.*

[17] *See* Federal Trade Commission, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain- language/pdf0205-startwithsecurity.pdf (last visited July 28, 2021).

[18] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited August 22, 2023).

plan ready in the event of a breach.[19]

54. Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[20]

55. Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

### *The Impact of Data Breach on Victims*

56. Defendants' failure to keep Plaintiff's and Class Members' PII/PHI secure has severe ramifications. Given the highly sensitive nature of the PII/PHI stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

57. The PII exposed in the Data Breach is highly-coveted and valuable on underground

---

[19] *Id.*

[20] Federal Trade Commission, *Start With Security*, *supra footnote 17*.

markets. Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

58. Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

59. Given the confirmed exfiltration of Select's customers' PII/PHI from NRS, many victims of the Data Breach have likely already experienced significant harms as the result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

60. It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;

- 10% reported feeling suicidal.[21]

61. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[22]

62. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

63. The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent

[21] https://www.idtheftcenter.org/wpcontent/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (Last visited June 8, 2025).
[22] *Id.*

value to its owner, which has been recognized by courts as an independent form of harm.[23]

64. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

65. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. The unconsented disclosure of confidential information to a third party;

b. Unauthorized use of their PII/PHI without compensation;

c. Losing the value of the explicit and implicit promises of data security;

d. Losing the value of access to their PII/PHI permitted by Select without their permission;

e. Identity theft and fraud resulting from the theft of their PII/PHI;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i. Unauthorized charges and loss of use and access to their accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent

[23] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII/PHI being in the possession of one or more unauthorized third parties.

66. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[24]

67. Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[25]

68. Plaintiff and Class Members have a direct interest in Defendants' promises and duties to protect their PII/PHI, i.e., that Defendants *not increase* their risk of identity theft and fraud. Because Defendants failed to live up to their promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them

[24] E. Harrell, U.S. Department of Justice, *Victims of Identity Theft, 2014* (revised Nov. 14, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (Last visited August 22, 2023).

[25] https://web.archive.org/web20220205174527/https://www.fireeye.com/blog/executive-perspective/2016/05/beyong_the_bottomli.html (Last visited August 15, 2023).

for the present harm and continuing increased risk of harm caused by Defendants' wrongful conduct. Through this remedy, Plaintiff seeks to restore themselves and Class Members as close to the same position as they would have occupied but for Defendants' wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII/PHI.

69. Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII/PHI permitted through Defendants' wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by. Another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a nonpracticing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

70. Plaintiff and Class Members have an interest in ensuring their PII is secured and not subject to further theft because Defendants continue to hold their PII.

## CLASS ACTION ALLEGATIONS

71. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following proposed Nationwide class, defined as follows:

**<u>Nationwide Class</u>**

> All persons residing in the United States whose personally identifiable information or personal health information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

In addition, Plaintiff brings this action on behalf of himself and the following proposed subclass (the "Select Subclass"), defined as follows:

**<u>Select Subclass</u>**

> All persons whose personally identifiable information and personal health information was given to Nationwide Recovery System, Inc. by Select Medical Holdings Corporation and was accessed in the Data Breach by unauthorized persons, including all those persons who were sent a notice of the Data Breach.

72. Both the proposed Nationwide Class and the proposed Missouri Subclass will be collectively referred to as the Class, except where it is necessary to differentiate them.

73. Excluded from the proposed Class are any officer or director of Defendant; any officer or director of any affiliate, parent, or subsidiary of Select or NRS; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

74. **Numerosity.** Members of the proposed Class are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Defendants' own records.

75. **Commonality and Predominance.** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether Defendants engaged in the wrongful conduct alleged herein;

b. Whether Defendants' inadequate data security measures were a cause of the Data Breach;

c. Whether Defendants owed a legal duty to Plaintiff and the other Class Members to exercise due care in collecting, storing, and safeguarding their

PII;

d. Whether Defendants negligently or recklessly breached legal duties owed to Plaintiff and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

e. Whether Plaintiff and the Class are at an increased risk for identity theft because of the Data Breach;

f. Whether Defendants failed to implement and maintain reasonable security procedures and practices for Plaintiff's and Class Members' PII in violation of Section 5 of the FTC Act;

g. Whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

76. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

77. **Typicality:** Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII or PHI accessed by and/or disclosed to unauthorized third parties. Defendants' misconduct affected all Class Members in the same manner.

78. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because their interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and their counsel.

79. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered

in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT I
## BREACH OF IMPLIED CONTRACT
***Against Select Only on Behalf of Select Subclass***

80. The preceding factual statements and allegations are incorporated herein by reference.

81. Plaintiff brings this claim individually and on behalf of the Select Subclass against Select only.

82. In connection with receiving healthcare services, Plaintiff and all other Class Members entered into implied contracts with Select.

83. Pursuant to these implied contracts, Plaintiff and Class members paid money to DRH (directly or through their insurance) and provided Select with their PII/PHI. In exchange, Select agreed to, among other things, and Plaintiff and Class members and Select mutually understood that Select would: (1) provide healthcare or related services to Plaintiff and Class members; (2) use Plaintiff's and Class members' PII/PHI to facilitate providing healthcare services to Plaintiff and Class members; (3) take reasonable measures to protect the security and

confidentiality of Plaintiff's and Class members' PII/PHI; and (4) protect Plaintiff's and Class members PII/PHI in compliance with federal and state laws and regulations, industry standards, and Select's representations regarding its security and privacy practices

84. The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class Members, on the one hand, and Select, on the other hand. Indeed, Select recognized the importance of data security and the privacy of its patients' PII/PHI in its Privacy Policy. Plaintiff and Class Members and Select mutually understood and agreed that the healthcare or related services Select would provide to Plaintiff and Class Members included Select's protection of Plaintiff's and Class Members' privacy and PII/PHI. Had Plaintiff and Class Members known that Select would not adequately protect its patients' and former patients' PII/PHI, they would not have paid for or obtained healthcare or related services from Select. As a condition of the purchase, Defendants required Plaintiff and Class Members to provide their PII, including names, addresses, dates of birth, Social Security numbers, driver's license numbers, and other personal information. Implied in these exchanges was a promise by Defendants to ensure that the PII/PHI of Plaintiff and Class Members in its possession was only used to provide the agreed-upon products and services from Defendants.

85. Plaintiff and Class members performed their obligations under the implied contract when they provided Select with their PII/PHI and paid for healthcare or related services from Select, expecting that their PII/PHI would be protected.

86. Select breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI, and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class Members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

87. Select's breach of its obligations of the implied contracts with Plaintiff and Class Members directly resulted in the Data Breach and the resulting injuries to Plaintiff and Class Members.

88. Plaintiff and all other Class members were damaged by DRH's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they now face a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) they overpaid for the services that were received without adequate data security.

**<u>COUNT II</u>**
**NEGLIGENCE**

89. The preceding factual statements and allegations are incorporated herein by reference.

90. Defendants owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PII/PHI from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiff's and Class Members' PII/PHI in Defendants' possession was adequately secured and protected.

91. Defendants owed, and continue to owe, a duty to Plaintiff and the other Class

Members to safeguard and protect their PII/PHI.

92. Defendants breached their duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiff's and the other Class Members' PII/PHI.

93. It was reasonably foreseeable that Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' PII/PHI would result in an unauthorized third-party gaining access to such information for no lawful purpose.

94. As a direct result of Defendants' breach of their duty of confidentiality and privacy and the disclosure of Plaintiff's and the Class Members' confidential medical information, Plaintiff and the Class Members suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

95. By engaging in the negligent acts and omissions alleged herein, which permitted an unknown third party to access NRS's systems containing the PII/PHI at issue, Defendants failed to meet the data security standards set forth under Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures, which Defendants have failed to do as discussed herein.

96. Defendants' failure to meet this standard of data security established under Section 5 of the FTC Act is evidence of negligence.

97. Neither Plaintiff nor other Class Members contributed to the Data Breach as described in this Complaint.

98. Defendants' wrongful actions and/or inaction and the resulting Breach (as described above) constituted (and continue to constitute) negligence at common law.

99. As a result of Defendants' above-described wrongful actions, inaction, and want of

ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF FIDUCIARY DUTY
***Against Select Only on Behalf of Select Subclass***

100. The preceding factual statements and allegations are incorporated herein by reference.

101. Plaintiff brings this claim individually and on behalf of the Select Subclass against Select only.

102. As a condition of obtaining services from Select, Plaintiff and Class members gave Select their PII/PHI in confidence, believing that Select would protect that information. Plaintiff and Class Members would not have provided Select with this information had they known it would not be adequately protected. Select's acceptance, use, and storage of Plaintiff's and Class Members' PII/PHI created a fiduciary relationship between Select and Plaintiff and Class Members. In light of this relationship, Select must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiff's and Class Members' PII/PHI.

103. Select has a fiduciary duty to act for the benefit of Plaintiff and Class Members

upon matters within the scope of their relationship. It breached that duty by, among other things, failing to, or contracting with third parties that failed to, properly protect the integrity of the system containing Plaintiff's and Class Members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class Members' PII/PHI that it collected, utilized, and maintained.

104. As a direct and proximate result of Select's breach of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT IV**
**UNJUST ENRICHMENT**

105. Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

106. This claim is pleaded in the alternative to the breach of implied contract claim.

107. Plaintiff and Class Members conferred a monetary benefit upon Defendants in the form of monies paid to Select for related services, which Select in turn used to pay NRS for its services, with an implicit understanding that Defendants would use some of these payments to protect the PII/PHI they collect, store, and use to provide health care.

108. Defendants accepted or had knowledge of the benefits conferred upon them by

Plaintiff and Class Members. Defendants also benefited from the receipt of Plaintiff's and Class Members' PII/PHI, as this was used to facilitate billing and payment services and other aspects of Defendants' business.

109. As a result of Defendants' conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

110. Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendants failed to adequately implement the data privacy and security procedures that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

111. Defendants should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Petition, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing Plaintiff's counsel as Lead Counsel for the Class;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing

another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

Dated: June 11, 2025

Respectfully submitted,

By:______________________________
Benjamin F. Johns (PA ID 201373)
Jonathan Shub (PA ID 53965)
Samantha Holbrook (PA ID 311829)
**SHUB JOHNS & HOLBROOP LLP**
200 Barr Harbor Dr., Suite 400
Conshohocken, PA 19428
Tel: 610-477-8380
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com

***Attorneys for Plaintiff and the Class***